SMITH-BOOTH-USHER CO. v. DETROIT COPPER MINING CO. OF ARIZONA.

(Circuit Court of Appeals, Ninth Circuit. February 1, 1915.)

No. 2472.

TRIAL ☞139—DIRECTION OF VERDICT—POWER OF COURT.

On a motion for directed verdict, the court may not weigh the evidence; and if the facts are disputed, or if there is substantial evidence both ways, even if there be a preponderance of evidence one way, it is for the jury to determine what facts are established.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. ☞139.]

In Error to the District Court of the United States for the District of Arizona; Wm. H. Sawtelle, Judge.

Action at law by the Smith-Booth-Usher Company against the Detroit Copper Mining Company of Arizona. Judgment for defendant, and plaintiff brings error. Reversed.

On December 5, 1912, the plaintiff, the Smith-Booth-Usher Company, entered into a contract with the defendant, the Detroit Copper Mining Company of Arizona, by the terms of which the plaintiff undertook to furnish to the defendant three 200 H. P. International Amet crude oil gas producers. The machinery was to be "as described in the Manufacturers' Bulletin, or of the latest improved design." It was to be shipped from Los Angeles to Morenci,

Ariz., where the defendant's plant is located. The defendant was to pay the plaintiff $10,000, with interest at 6 per cent. from the date of erection, upon the completion of the 90 days' trial provided for in the contract. in case the apparatus met the guaranty specified. The machinery was intended to produce gas from crude oil. It consisted of three distinct units, which were to furnish gas into a single main, together with "scrubbers, oil pump, and plans and specifications." In order to complete the gas producing plant, the defendant bound itself to furnish a 15,000 cubic feet gas holder and the necessary auxiliary machinery, including pipes and mains. In the latter part of February, 1913, the apparatus was shipped. At the request of the defendant, the plaintiff's erecting engineer, Vorhees, went to Morenci about March 8th, and superintended the erection of the machinery. It was completed about March 27, 1913. Cox, the plaintiff's sales engineer, went to Morenci April 2, 1913, and began the tests of the machinery in the 90 days' trial provided for in the contract. The tests were continued until May 7, 1913. There is evidence that with the consent of the defendant Cox then left Morenci, pending the decision of the defendant on his suggestion that it install a new gas washer for the machinery, and with the intention of returning and continuing the tests. On May 28th the defendant advised the plaintiff that it would go no further with the tests under the contract. The defendant refused to continue with the contract, and refused to pay for the machinery.

The plaintiff in its complaint alleged its performance of the written contract, and a breach of the same by the defendant in failing to supply the 15,000 cubic feet gas holder, and in refusing to proceed with the test. The defendant answered, denying that it failed or refused to furnish the 15,000 cubic feet gas holder, denying that the machinery met any of the guaranties specified in the agreement, admitting that on or about May 28th it had notified the plaintiff that it would go no further with the contract, but alleging that prior to that notice the plaintiff, after it had become fully apparent that the machinery could not be made to comply with the guaranties and conditions of the agreement, admitted that the same was not in compliance therewith, nor in conformity with the requirements of the agreement, and voluntarily abandoned further attempt to run or operate the same, and asked for a long extension of time in which to substitute other and different machinery, which request the defendant denied, and the defendant alleged that the gas produced by said machinery was so inferior in quality and grade, and so charged with soot and suspended matter, as to be not only entirely useless for the purposes for which it was intended, but so as to be highly injurious to the engines and gas-conducting pipes of the defendant.

Oscar C. Mueller and Alfred Wright, both of Los Angeles, Cal., and William M. Seabury, of Phœnix, Ariz. (John De R. Storey, of New York City, on the brief), for plaintiff in error.

Everett E. Ellinwood and John M. Ross, both of Bisbee, Ariz., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). At the close of the plaintiff's testimony, on the motion of the defendant that the jury be instructed to return a verdict in its favor, the court, in an extended instruction to the jury, reviewed and weighed the plaintiff's evidence, and concluded by saying:

"I have carefully examined the evidence in this case, and I find that it fails to show that the plaintiff has established that said apparatus did meet each and all of the guaranties specified in said agreement, and the defendant's motion to instruct the jury to return a verdict in its favor will be granted."

The circumstances under which a court may withdraw a case from the jury are stated by Mr. Justice Harlan, sitting with Judge Lurton

and Judge Sage in the Circuit Court of Appeals for the Sixth Circuit, in the leading case of Travelers' Ins. Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305, in which he said:

"The rule upon that subject has been defined in recent adjudications. The thought intended to be expressed in them is that the jury should be permitted to return a verdict according to its own view of the facts, unless upon a survey of the whole evidence, and giving effect to every inference to be fairly or reasonably drawn from it, the case is palpably for the party asking a peremptory instruction. A mere scintilla of evidence in favor of one party does not entitle him, of right, to go to the jury. Improvement Co. v. Munson, 14 Wall. 442, 448, [20 L. Ed. 867]. On the other hand, a case cannot properly be withdrawn from the consideration of the jury simply because, in the judgment of the court, there is. a preponderance of evidence in favor of the party asking a peremptory instruction. If the facts are entirely undisputed or uncontradicted, or if, upon any issue dependent upon facts, there is no evidence whatever in favor of one party, or, what is the same thing, if the evidence is so slight as to justify the ·court in regarding the proof as substantially all one way, then the court may direct a verdict according to its view of the law arising upon such a case. If a verdict is rendered contrary to the evidence, the remedy of the losing party is a motion for a new trial. In disposing of that motion, the court, in the exercise of a sound legal discretion, may interpose and prevent the injustice that may be done by such a verdict. While the court may instruct the jury as to the law arising upon a given or hypothetical state of facts, it is for the jury, if the facts are disputed, or if there is substantial evidence both ways, even if there be a preponderance of evidence one way, to say what facts are established. And this is what was meant by the observation in some cases that the court should not withdraw from the jury a case depending upon the effect or weight of testimony, unless the evidence should be of such conclusive character as to compel the court to set aside a verdict returned in opposition to it. Insurance Co. v. Doster, 106 U. S. 30, 32, 1 Sup. Ct. 18 [27 L. Ed. 65]. The court may be of opinion that, according to the weight of the testimony, a verdict should be returned for the party asking a peremptory instruction. But it may not, for that reason alone, give such an instruction. It may not take the case from the jury, on issues of fact, unless the evidence is so distinctly all one way that a different view of it would shock the judicial mind."

In Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 463, 477, 20 C. C. A. 596, 609, Judge Lurton said:

"We do not think, therefore, that it is a proper test of whether the court should direct a verdict that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions, he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether under the law a verdict might be found for the party having the onus."

Again, in Rochford v. Pennsylvania Co., 174 Fed. 81, 98 C. C. A. 105, Judge Lurton said:

"A motion for an instructed verdict, upon an insufficiency in law of the evidence, presupposes that the witnesses testifying to the facts adduced to make a case for the party against whom the motion is made are worthy of credit. It is as if the party making the motion had demurred to the evidence, and is equivalent to saying: 'We concede the truth of the facts which are

relied upon to make a case for the plaintiff, or a defense for the defendant; but they are insufficient in law to support a verdict, which must be founded upon such facts.'"

The right to a jury trial is guaranteed by the Constitution, and it is not to be denied except in a clear case. The foregoing decisions, and many others that might be cited, have definitely and distinctly established the rule that if there is any substantial evidence bearing upon the issue, to which the jury might properly give credit, the court is not authorized to instruct the jury to find a verdict in opposition thereto. Tested by these rules and on a careful consideration of the evidence in the case at bar, we are of the opinion that the cause should have been submitted to the jury.

One of the important provisions of the contract was that which gave the plaintiff the benefit of a 90 days' test. In the light of the testimony, it is clear that this provision secured to the plaintiff a substantial right, a right which was of the essence of the contract. The time which was devoted to the test was but 35 days. The defendant in its answer alleges a breach by the plaintiff of this provision of the contract. There was testimony, however, to the contrary. Cox, the testing engineer, testified that about May 6th Thompson, the defendant's general manager, stated to him that there was too much suspended matter in the gas, and that the gas must be cleaned better than it was being done at that time; that he answered Thompson by saying that by a system of sprays and sluicing the gas could be run through the pipe lines and through the holder without causing interruption of the service, but that, if he desired the gas cleaned better than it was being cleaned, there was an apparatus that had lately been tried at El Centro, whereby the gas could be cleaned absolutely; and that Thompson agreed to send an engineer to inspect that plant, and to be governed by the engineer's report, and would let the plaintiff know whether he was willing to grant an extension of time necessary to obtain that apparatus, and that it was upon that understanding that Cox left for Los Angeles on the following day, and he testified that he (Cox) held himself in readiness to return to Morenci to continue the test, as soon as he heard from Thompson. There is no evidence that Thompson ever did examine or cause to be examined the device at the El Centro plant, and it was not denied that a week later Thompson stated to Mr. Smith, the president of the plaintiff, at Los Angeles, that the defendant had made other arrangements, and had no longer any use for the plaintiff's apparatus. On May 27th Thompson wired the plaintiff that the defendant did not desire to continue with the contract. On May 28th Thompson wrote the plaintiff a letter, in which he set forth the real reasons why he wished to avoid the contract. He wrote:

"Our reasons for doing so are not so much because we doubt that you could finally make clean gas, but because the apparatus required for this and for handling the soot far exceeds anything we were led to expect when we negotiated for the plant."

The letter further explains that the plant so furnished, together with the washing apparatus, would occupy so much space that it would

be out of the question to install another gas plant, as was contemplated, on the defendant's premises.

The court below found failure of proof of the plaintiff's compliance with its contract principally in the fact that there was present in the gas produced by its machinery lamp black, which the court said clogged the defendant's gas pipes. But the evidence shows that the clogging was not in the gas pipes, but in the washers of the units; that the presence of lamp black was to be expected, and to be dealt with, and that the plaintiff, even if it had not already done so, expected, in the course of its tests so to control the same as to obviate the clogging. The contract stipulated that there should be "no suspended matter contained in the gas which will be injurious to the engines or gas-conducting pipes" of the defendant. This is all that the contract required as to the quality of the gas. It did not require that there should be no lamp black in it. Mr. Cox, who was admitted by the defendant to be a qualified expert, testified that the small amount of suspended matter in the gas would have no injurious effects on the defendant's engines or pipes, and although he admitted that the suspended matter might after a time cause the pipes to become clogged unless they were sluiced or cleaned, he testified that the cleaning could be done without closing down the plant, and it was in this connection that he testified that he proposed to Mr. Thompson to introduce the apparatus which would absolutely clean the gas, if the defendant desired it better cleaned, but at the same time he stated that the gas met the requirements of the contract.

One Ensign, an electrical mechanical engineer, testified that at Yuma the same kind of gas producers as those which the plaintiff had installed, used under similar conditions, produced gas which carried more lamp black, before it reached the holder, but that after four years of continuous use it produced less than three inches of lamp black in the bottom of the holder. In brief, there was evidence that the plaintiff had fully complied with its contract; that the gas producers produced a gas sufficiently free of matter in suspension as not to be injurious to the "engines or gas-conducting pipes" of the defendant; that after a test of 35 days, it was still ready and willing to make further tests and alterations in order to satisfy the defendant, and that the defendant refused to abide by the contract, principally for reasons which had nothing to do with the terms and provisions thereof. The case was clearly one for the jury.

The judgment is reversed, and the cause is remanded for a new trial.