## UNITED STATES FIDELITY & GUARANTY CO. v. BLAKE.

(Circuit Court of Appeals, Ninth Circuit. January 8, 1923. Rehearing Denied February 19, 1923.)

No. 3890.

1. **Appeal and error** ⬅997(3)—**Refusal to direct verdict not reversed, unless evidence would not support verdict for opposite party.**

When the refusal to direct a verdict is reviewed on writ of error, the question is whether there was any evidence to sustain the verdict, and whether the evidence to support the directed verdict requested was so conclusive that the trial court, in the exercise of a sound judicial discretion, should not sustain a verdict for the opposing party.

2. **Trial** ⬅139(1)—**Court cannot weigh evidence on motion for directed verdict.**

On a motion for a directed verdict, the court may not weigh the evidence, and if there is substantial evidence for both parties, it is for the jury to determine what facts are established, even if their verdict be against the decided preponderance of the evidence.

3. **Insurance** ⬅665(5)—**Evidence held to sustain jury's finding death of insured was not intentional, and did not result indirectly from disease.**

In an action on an accident insurance policy, where the defense was based on clauses exempting injury contributed to indirectly by disease and loss resulting from any act which, if done by insured while in possession of all mental faculties, would be deemed intentional, evidence that insured was sick in bed with pneumonia, and that he rose from his bed and almost immediately fell through a window and was killed, *held* not to show conclusively that his act was intentional, or indirectly caused by his illness, so as to require a directed verdict for the insurance company.

At Law. Action by Robert S. Blake, a minor, by Grace Twiggs Blake, his guardian, against the United States Fidelity & Guaranty Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The defendant in error, a minor child of Edward M. Blake, as the beneficiary of a policy of accident insurance issued to his father by the plaintiff in error, recovered a judgment on the policy in the court below. The policy provided "against loss as hereinafter defined resulting directly and independently of all other causes from accidental bodily injuries, fatal or nonfatal." It contained this proviso: "This policy does not cover any accidental bodily injury caused or contributed to directly or indirectly by sickness or disease, * * * nor loss resulting from any means or act which, if used, done, or self-inflicted by the insured while in possession of all mental faculties, would be deemed intentional." The complaint alleged that on January 12, 1921, the insured died, and that his death resulted directly and independently of all other causes from accidental bodily injuries received by him in accidentally falling through the window of his room on the fourth floor of certain described premises, resulting in immediate death.

The answer denied that the death of the insured resulted, directly and independently of all other causes, from accidental bodily injuries received by him in accidentally falling through the window, and denied that he accidentally fell through the window, and alleged that the insured, on the date of his death and for several days prior thereto, had been seriously ill from pneumonia and was confined to his bed under the care of a physician, and that his body and mind were weakened from the disease, and that against the advice of his physician he got up from his bed, and, by reason of said sickness being weakened in body and mind, he jumped or fell from the window of his room.

It was shown in evidence that the sill of the window through which the

insured fell was 21½ inches from the floor; that the window was hinged at the top and swung outward from the bottom; that the bed occupied by the insured was about 2 feet from the window.

For the plaintiff in error, the physician who was in attendance upon the insured testified that the insured, on the morning of his death, being quiet in bed, remarked that he thought it was about time to get out and try his legs, that he had a number of things on his mind, and he had to arrange for a certain conference, and felt that he must get himself in shape to be present; whereupon the physician told him it was not time to try his legs, that he was approaching the crisis of his disease, and that at such a time there was a great deal of weakness, particularly of the heart muscle; that the thing to do was to take care of the heart muscle. Said the witness: "When he said he wanted to try his legs, he sat up in bed and made an effort to remove the covers. I took the covers and put them up to his neck, covering his arms, and put him back in bed. Then I had my hand on his wrist underneath the bed covers, apparently taking his pulse, but meaning to hold onto him at that time. And as I talked to him in that strain as to recognizing my authority, where I would perhaps recognize his in a matter that concerned his profession, he said: 'I think you are right and we should give every consideration to your opinion.' Then he went along for a number of minutes talking in that strain, apparently perfectly quiet, so much so that I relaxed my vigilance perhaps, and just simply had my hand on his pulse. Then he would, from apparently being sane enough to realize the force of my argument, suddenly make a remark that I recall distinctly, 'Well, isn't it fine that we are on the same boat together; it is nice to meet you on this boat;' and then he would recur again to his previous statement that he felt he should recognize my authority and give it every consideration; and then suddenly, without any warning at all, the first thing I knew was that these bed covers were over my head, and by the time that I had disengaged myself from the bed covers all that I saw was the nurse hanging onto him and he head down out of the window. I couldn't see his head any more, but just his buttocks going through the window. I thought she grabbed him by the leg, but it was so quick; it was a flash, and he was gone."

The physician further testified that he was sitting on a chair on the opposite side of the bed from the window and that the nurse was standing between the bed and the window, that the insured was actively delirious that morning and was in a very weak condition due to his sickness, and that he would probably have fallen had he stepped anywhere on the floor of the room, that the window was between 20 and 24 inches from the bed, that in his opinion the insured was so delirious that day that he did not know what he was doing, with the exception that he showed one moment of apparent lucidity during the 15 minutes that the physician was there, and that it would have been possible, considering the height of the window and the fact that it swung outward from the bottom, for the insured to have lost his balance and "headed out of the window."

On behalf of the plaintiff in error, the nurse testified that the insured began to be delirious on January 10th, and was delirious on the 11th and on the 12th, that on the morning of the 12th it was worse than it had been, that he was very restless, and she was trying to keep him covered, and he would throw the covers off. "I would replace them, and that would irritate him, and in that connection he said he was getting madder and madder. After the doctor came, he said he wanted to get out of bed and try his legs. He said to the doctor, 'I want to see how strong I am, and if I am able to stand up,' * * * There was a space between the north wall and the bed, 19 inches or 2 feet wide. I could walk back of there very comfortably. I was standing there. I thought I was looking at Mr. Blake. I saw the bedclothes go over, or off the bed rather. I didn't know they had gone over Dr. Strietmann's head, but I knew they went to that side of the bed, and I realized he might go out of the window, and I looked and he was half way out of the window. I seized him by his left arm to pull him back, but he was overbalanced. The heavier part of his body was already out the window. * * * The window swung out as he went against it. * * * From January 10th to January 12th, Mr. Blake at times was so that he could converse

rationally and understand what was said to him, as apparently delirious patients are at times. * * * He never expressed any desire to destroy himself, or said anything about committing suicide."

Among the witnesses for the defendant in error was the widow of the insured, who testified that at 2 o'clock in the morning of the day of the accident the insured had risen from his bed and without assistance had walked from his room out into the hall and to the bathroom and back; that he walked perfectly upright, without any sign of weakness; that during his illness he apparently had no difficulty in breathing; that just before the accident the witness was at the foot of his bed; that she started to answer the doorbell and walked a few steps into the hall. She said: "I heard a noise, turned around, and Mr. Blake was falling out of the window. He had stumbled, and overbalanced himself, and he was falling out of the window. The manner in which he was falling out of the window, the appearance that it had, was that he had stumbled. I know that he did not fall from weakness, because he did not sink from weakness, as, if he had been too weak to stand, he would have sunk and crumpled up more." She testified that the bedroom occupied by the insured had a very highly polished hardwood floor, and there was no covering on the floor between the bed and the window.

Jos. A. McCullough, of Baltimore, Md., and Chadwick, McMicken, Ramsey & Rupp, of Seattle, Wash., for plaintiffs in error.

Richard H. Johnson and Carey H. Nixon, both of Boise, Idaho, for defendant in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The only assignment of error is that the trial court denied the motion of the plaintiff in error for an instructed verdict in its favor. The ground of the motion was that, in view of the provisions of the policy, the evidence was insufficient to sustain a verdict for the plaintiff. No exception was taken to the instructions to the jury. Among other things, the court charged the jury:

"It is for you to consider whether the accident and ensuing death resulted indirectly from the sickness or disease of the insured. If you find that he jumped or threw himself out of the window intentionally, the plaintiff cannot recover. * * * Upon the question whether he was delirious at the moment of his death, that is when he got from the bed through the window, the testimony may be said to be somewhat conflicting, and that is one of the questions and one of the principal questions upon which you are to find from all the evidence. * * * And if you find that in a delirious or partially delirious condition, to escape his nurse and physician, he precipitated himself against and through the window, or—and this is the other branch of the exception in the policy and the defense of the defendant—or, being too weak to stand, and, contrary to the advice of his physician, he suddenly tried to stand, and, because of his weakness and sickness, fell over and against and through the window, the plaintiff cannot recover."

[1] By these and other instructions, the issues of fact were made clear to the jury. In Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, the court observed that "cases are not to be lightly taken from the jury; that jurors are the recognized triers of questions of fact," but added:

"At the same time, the judge is primarily responsible for the just outcome of the trial."

Under the settled doctrine as applied by all the federal appellate courts, when the refusal to direct a verdict is brought under review on writ of error, the question thus presented is whether or not there was any evidence to sustain the verdict, and whether or not the evidence to support a directed verdict as requested, was so conclusive that the trial court in the exercise of a sound judicial discretion should not sustain a verdict for the opposing party.

[2] And on a motion for a directed verdict the court may not weigh the evidence, and if there is substantial evidence both for the plaintiff and the defendant, it is for the jury to determine what facts are established even if their verdict be against the decided preponderance of the evidence. Travelers' Ins. Co. v. Randolph, 78 Fed. 754, 24 C. C. A. 305; Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 Fed. 463, 20 C. C. A. 596; Rochford v. Pennsylvania Co., 174 Fed. 81, 98 C. C. A. 105; United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 Fed. 946; Smith-Booth-Usher Co. v. Detroit Copper Mining Co., 220 Fed. 600, 136 C. C. A. 58. In the case last cited this court said:

"The right to a jury trial is guaranteed by the Constitution, and it is not to be denied, except in a clear case. The foregoing decisions, and many others that might be cited, have definitely and distinctly established the rule that if there is any substantial evidence bearing upon the issue, to which the jury might properly give credit, the court is not authorized to instruct the jury to find a verdict in opposition thereto."

[3] It may be conceded that the evidence in the present case brings it close to the line which divides cases which should be left to the decision of the jury from cases in which verdict should be directed by the court, and the question is not wholly free from doubt. But upon a careful consideration of all the evidence we are not convinced that the court below erroneously denied the motion for an instructed verdict. There was evidence on behalf of the defendant in error which tended to show that the crisis of the illness of the insured had been reached on the morning on which he died. It was shown that his temperature and pulse that morning were normal, and that his illness was of a mild character. There was no evidence that he was too sick to stand on his feet and walk. Several hours earlier that morning he had proven his ability to walk. Dr. Strietmann testified that there was absence of the physical conditions he would expect to find following the crisis in pneumonia, such as "a rather rapid heart, a thready sort of pulse, and a weak or collapsed condition."

It was shown that the insured was a strong man, and that during his illness he took nourishing food. Two physicians who knew him stated that in their opinion, based upon all the facts, he was strong enough on that morning to have stood upon his feet and walked without falling from weakness. The testimony of Mrs. Blake that she heard a noise, and turned back to the room to see what was the cause of it, may have been taken by the jury as indicating the noise of one slipping or stumbling on the floor. Notwithstanding the evidence that the insured had passed through a spell of illness of 5 days' duration and was to some extent weakened thereby, we cannot say, in the light of all the evidence, that there was no substantial evidence to sustain the conclusion that the accident which happened might have happened to

a man who was strong and well, and in the possession of all his faculties, and that it was not contributed to by delirium or illness, or the weakness attendant thereon.

The judgment is affirmed.