## UNITED STATES v. GOWER et al.
### No. 422.

Circuit Court of Appeals, Tenth Circuit.
May 29, 1931.

C. L. Dawson, Atty., U. S. Veterans' Bureau, of Washington, D. C. (Jno. M. Goldesberry, U. S. Atty., and A. E. Williams, Asst. U. S. Atty., both of Tulsa, Okl., and William Wolff Smith, General Counsel, U. S. Veterans' Bureau, of Washington, D. C., on the brief), for the United States.

Glenn O. Young, of Sapulpa, Okl., for appellees.

Before LEWIS, and COTTERAL, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

Claude Gower, a soldier in the World War, was discharged from service on June 3, 1919, and immediately returned to his father's home in Oklahoma. He sought employment of different kinds, but after short service in each he in turn quit because he could not continue on account of his physical and mental condition. Early in November, 1919, he was accidentally and fatally shot. While in the military service two policies of term insurance of $5,000.00 each were issued to him on which premiums were paid to July 31, 1919.

His father and mother, appellees here, brought this suit on the policies as beneficiaries and recovered. They alleged that their son suffered total permanent disability during the life of the policies. The defendant below has appealed and contends that the verdicts are not sustained by the proof, hence the court erred in overruling defendant's motion for an instructed verdict in its favor; that the case should not have been submitted to the jury. That is the only error assigned, and the argument here is that the evidence does not sustain a finding that the insured suffered total permanent disability while the policies were in force.

On that subject Doctor King, who had practised medicine for twenty-five years and had served as physician in the Medical Corps of the United States Army, was called as a witness. He saw and treated the insured twice a week for three or four weeks after his return home from military service. He testified that the physical and mental condition of Gower was very poor. He had a rapid heart, listless expression, undernourished condition, both lungs abnormal, and more or less adema of the hands and face; that from the history of the case he determined that the patient was suffering from gas poison, and that in his opinion he was not able to perform any substantial and gainful work; that while he was attending him he did not improve to amount to anything. He would have spells like asthma. When asked as to whether Gower might have recovered had he not been accidentally shot, witness said he had a chance to get well. Asked whether or not his condition was permanent, he answered, "No, Sir"; and asked whether he was able to say his condition was temporary, he answered, "No, Sir."

Members of insured's family and others for whom he tried to work described his condition, action and inability to continue except for very brief periods at different kinds of labor. A grocer who employed him to deliver groceries in the town testified that when he would direct him to go to one part of town, he would go to another part, and he would have to go or send someone after him; that his mind seemed to wander; he kept trying to get him to work for some eight or ten days; that he was flighty and trembly, would give out and sit down. He tried other employment. He shucked corn for a day or so, and quit because he was sick. His appetite was poor, and he didn't sleep much. He tried to work in the cane at another place, but quit in a short time, and was sick in bed there for about three days. He tried to pick cotton, but became short of breath and had to quit. There was testimony that he fell from a horse for no apparent cause. Another witness testified he did not seem the same boy after he came back that he was before, that he could not hold down a job.

Another neighbor testified that he was just silly, foolish. His father testified that he worked for about a week with him after he came home, and had to quit. His mother testified that he complained of headaches, and of the back of his head, and of his breast; and after he worked a little he was unstrung and nervous. That he was wakeful, didn't rest at night, mumbled and groaned in his sleep, and had poor appetite. At times his hands would be swollen.

Other neighbors who saw and talked with Gower after his return testified they did not notice any change in him, either mentally or physically. We do not doubt there was ample proof to sustain a finding that insured was totally disabled to engage in any gainful occupation on his return home, and that that disability continued while the policies were in force. A contrary conclusion, in our judgment, would be against the greater weight of the evidence.

The real question here is whether the total disability thus proven and evidently found to exist, while the policies were still in force, was of such character and of such grip upon insured's vitality as to cause it to be reasonably certain that it would be permanent, thus disabling insured to follow continuously any substantially gainful occupation during the remainder of his natural life.

Doctor King, the only witness called who was competent as an expert to give an opinion on the subject of the extent of the soldier's disability, was not asked if that disability was total and permanent. He was asked whether the condition under which he found the soldier was a permanent condition, and he answered, No. His condition might have been fluctuating—better and then worse, and vice versa—but still in the doctor's opinion one of permanent and total disability to ever follow continuously any substantially gainful occupation. In fact, he said the soldier's condition was not temporary, and had previously said he was not able to perform any substantial and gainful work. He also testified the soldier had a chance to get well—a possibility, not a probability. So, it cannot be fairly said the verdicts were opposed to the judgment and opinion of the only witness competent to speak on this vital subject. Moreover, expert testimony is only an aid to the solution of the main issue. It cannot be arbitrarily ignored or indolently accepted, and after it has been considered by the jury, if they believe their own experience, observations and common knowledge, as applied to the facts in the case, will guide them

to a solution and verdict, they have a right to follow their own convictions, thus reached, although in doing so their verdict may be contrary to the opinion evidence of experts on the subject. United States Smelting Co. v. Parry (C. C. A.) 166 F. 407, 411; Head v. Hargrave, 105 U. S. 45, 47–49, 26 L. Ed. 1028; The Conqueror, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937; Jones on Evidence (2d Ed.) § 1373. After consideration of the evidence in the record, both that of laymen and the attending physician, as to the soldier's ailments and their effects upon him physically and mentally, we cannot hold that the proof does not sustain the verdicts.

Judgments affirmed.