## UNITED STATES v. BURKE.

### No. 6269.

Circuit Court of Appeals, Ninth Circuit.

June 1, 1931.

Anthony Savage, U. S. Atty., and Thomas E. De Wolfe, Asst. U. S. Atty., both of Seattle, Wash., and William Wolff Smith, Gen. Counsel, United States Veterans' Bureau, Bayless L. Guffy and Edward S. Ragsdale, Attys., United States Veterans' Bureau, all of Washington, D. C., and Lester E. Pope, Atty., United States Veterans Bureau, of Seattle, Wash.

Ralph A. Horr and Philip Tworoger, both of Seattle, Wash., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

David A. Burke, appellee, hereinafter referred to as plaintiff, enlisted in the United States Army June 15, 1915, and was honorably discharged on the surgeon's certificate of discharge June 16, 1919. On February 1, 1918, he was granted while in the service a contract of war risk term insurance in the sum of $5,000, payable in monthly installments in the case of total and permanent disability. He claimed total and permanent disability from June 17, 1919, and from a judgment in his favor the government appeals.

Plaintiff testified as follows: He was kicked by a mule shortly after he enlisted in 1915, and during the time he was in the service of the United States government he was sent to a hospital in China for over a year, off and on many times. His knee would swell, and he would be in a hospital for 6 weeks, then be marked "quarters" for two or three days, and he would then again be sent to the hospital. While he was in the hospital in China under United States government surgeons, he had an operation on his right knee in 1916, then came to the Letterman General Hospital in San Francisco, where he stayed 2 months or more, until he was called before a board and discharged with disability. After his discharge, he went to Payette, Idaho, his home, and stayed there until November, 1919.

Plaintiff further testified: "I did nothing while there [i. e., Payette], my knees were sore at that time and it was painful"; that from Payette he went to take training under the Public Health Service at Boise, and remained in the latter place until 1921, although not in training. He was in training approximately 10 days. He left Payette and went to St. Francis Hospital, where he was operated on for appendicitis. After leaving this hospital, he was given a six months' leave before going into training, and did not do anything; then he went into training again as an automobile mechanic and spent 4 months at Boise. This training consisted in bringing supplies from the stock room to mechanics working on cars. At the end of 4 months' training, he was again put in the Public Health Service Hospital at Boise, a government hospital, for an operation for adhesions. He was there over a year, then afterwards in 1920 was transferred to Tacoma, where he remained until August, 1920, during which time he did nothing. He returned to Payette, stayed there until October, 1920, and then went back to Tacoma about 1921. He did nothing while in Tacoma, for his legs were such that he could not do anything, and had been in that condition since he left the service. Under the supervision of the Veterans' Bureau he was taken to the Tacoma General Hospital, where he stayed until September, 1922, when he was ordered to the Veterans' Bureau Hospital at Boise, and stayed there under treatment a little over a year. He left the latter hospital in 1923 and went to the Soldiers' Home at Sawtelle, stayed there until January, 1924, and was then transferred to the Veterans' Bureau at Hot Springs, Ark., where he remained 4 months, later returning to Payette, where he remained until July, 1925. He was then sent by the Veterans' Bureau to a hospital at Boise, where he remained until he was discharged in September, 1925.

Plaintiff said further that at that time he was unable to do anything, and that he did not do anything because the Veterans' Bureau told him not to; that he stayed in Payette until July, 1926, when he was ordered to the Boise hospital by the Veterans' Bureau, where he remained 3 or 4 months. He returned to Payette, thence to Seattle, where he stayed until July, 1927, since which time he has done nothing. At this point he exhibited his knee to the jury, and, in answer to a question propounded by the court, said that that condition of his knee had been continuous since his discharge.

On cross-examination plaintiff testified that he paid no premium on his insurance after he was discharged. When he left the service, he did not go to work for a while, went out on a threshing machine for a couple of days, then went into training for a while in 1919 with the Idaho Power Company. He was in the latter place only about 10 days, was in the hospital a good part of the time on sick leave, and had appendicitis, for which he had an operation in December, 1919. His knees were then in the same condition as they were at the time of the trial. In January, 1920, he had vocational training as an automobile mechanic; drew pay for one or two weeks there. During all this time he was receiving $80 a month from the government.

Plaintiff identified Government's Exhibits A2 and A3 signed by himself, these two exhibits reporting that the training was satisfactory, and that he was following the course of work as outlined. In one of the statements signed by witness it was stated that he was learning how to set up pistons, tighten up bearings, adjust and reline brakes; that he was on the pay roll, and received 30 cents an hour. Later on in the cross-examination witness stated that the work that he did was while in a sitting position; that he himself never adjusted any steering gear or relined brakes; that he helped the mechanics once in a while; that he was under the impression that the pay there came from the mechanics as a donation, and that he did not recall signing any pay roll.

Plaintiff testified also that the government doctors told him to report to the hospital for examination and treatment ever so often, that he had not been in the hospital for 3½ or 4

years prior to the date of trial, and had not tried to work during that time.

Edward Carico, witness for plaintiff, testified that he had known plaintiff since 1906, that he saw him soon after plaintiff came from the Army in 1919 and at different times thereafter in Payette, Idaho; that plaintiff visited witness' father on the ranch, and remained there possibly a couple of days, doing no work while there; that plaintiff was complaining of his knees, and appeared to be in about the same condition as he was at the trial, possibly not quite so crippled. Plaintiff had to strain when he got out of the chair; his knees did not bend right, and he did no work. Carico said that he had observed Burke several times since he had seen him in Seattle and that there had been no change in the latter's condition; that when the latter visited witness' father he walked around over the farm, but not all of it.

Dr. Everett O. Jones, also a witness for plaintiff, testified that he was a surgeon admitted to practice in the state of Washington, had been engaged in the practice of surgery and medicine for 37 years; that he had examined plaintiff on March 3, 1930, and found that the latter had chronic synovitis (arthritis) involving both knee joints, and that as a result of this condition plaintiff has relaxation of the ligaments of both knee joints so that his knees are unstable. Because of this instability he has to keep the muscles of his legs in a state of constant contraction while he is standing, otherwise his knees would let him fall. The plaintiff has pains for two reasons: First, because of synovitis in his knee joints, and because of loose bodies in the knee joints which frequently get pinched or locked in the joints, thus causing pain and swelling; second, pain from spasms of muscles of the thighs, which is produced because of the unnatural tension of having to hold his muscles in when he is on his feet in order to keep from falling. Witness further stated that from the medical history of the case he would say that this had been a long-drawn-out condition, and that there were scars of two operations on the left knee and of one on the right. These operations had not cured plaintiff, and the latter's condition was permanent. On cross-examination witness stated that he had never seen this plaintiff until March 3, 1930, but that, quite aside from plaintiff's physical condition which would prevent him from doing any kind of manual labor, it had been his experience as a physican that persons who had been hospitalized as many times as this man were never good for any occupa-

tion. He went on to say that such persons were never any good; that they have no moral force; that they have lost their will or ability for independent effort of any sort. However, so far as the actual condition of plaintiff's knee is concerned, that would disable him from doing anything on his feet, but would not disable him from carrying on in some sedentary occupation.

John D. Pearce stated that he had been acquainted with plaintiff since August 1, 1899, and has had occasion to observe him since the latter's return from service in 1919. He first saw plaintiff in the early part of June, 1921, and had occasion to observe his condition at that time, and, as far as he could see, plaintiff was in a very bad condition; that he got out of a taxicab and came into witness' office, dropped into a chair, and seemed to be very weak, and had to lift himself up with his hands when he rose. Witness had occasion to see plaintiff many times since then, and said that occasionally the latter came into his office to sit and rest on his way to the Veterans' Bureau for treatment. Witness did not see plaintiff between 1922 and 1925, but has seen him many times since the latter date.

Three physicians were called as witnesses on behalf of the defendant. Dr. C. T. Smith testified that he had examined the plaintiff in July, 1925, and that he found arthritis (an inflammatory condition of the lining membranes in the joints which causes new bone growth in the joint itself) of the right knee and to a lesser degree in the left. Just what effect arthritis has upon the activity of the limb or knee depends on the growth in the knee. Dr. Smith said that at the time of his examination of the plaintiff in 1925 there was nothing in the latter's condition to prevent his following certain types of sedentary occupations where he did not have to be on his feet; for instance, practicing law or working as a bookkeeper or a shipping clerk, "anything that requires sitting down." He said that plaintiff's condition was permanent.

The testimony of the other two physicians called on behalf of the defendant tended to corroborate the testimony of Dr. Smith; that is, to show that plaintiff could do any kind of work "where he was sitting down, where he didn't have to stand on his feet."

At the end of the entire testimony, the defendant made a motion for a directed verdict in its favor on the ground that the evidence was not sufficient to establish a prima facie case. The question is whether the evi-

dence tending to establish total and permanent disability while the policy was in effect was sufficient to take the case to the jury. We do not weigh the evidence, but inquire merely whether there was sufficient evidence to sustain the verdict and judgment.

In considering whether the trial court erred in this respect, let us reflect for a few moments and consider the bearing of the evidence above referred to that was admitted on behalf of the plaintiff. We have at the outset a plaintiff who admittedly is suffering from a permanent disability, who has "chronic arthritis involving both knee joints and as a result of this condition has a relaxation of the ligaments of both knee joints so that his knees are unstable," who has been twice operated on for that condition, who has "instability of the knee joints, because of which he has to keep the muscles of his legs in a state of constant contraction when he is on his feet; otherwise, his knees would let him fall," "who suffers pain for two reasons, first because of the synovitis and arthritis in the knee joints and has loose bodies in his knee joints which frequently get pinched or locked in the joints, and second, because of the spasms of the muscles of the thighs which is produced because of the unnatural tension he has to hold his muscles in when he is on his feet in order to keep from falling," who must "sit and rest himself on his way to the Veterans' Bureau for treatment," who, when he arose from a chair, "lifted himself up," whose "joints were painful," who "was in a very bad condition and seemed to be very weak," who "had to strain when he got out of a chair and whose knees did not bend right," who exhibited his knee to the court and jury, and stated that the then existing condition of same had been continuous since his discharge, in whom there has been no change for the better during the last 3 years, and who was found by the Veterans' Bureau to be in need of vocational rehabilitation to overcome the handicap of his disability (38 USCA §§ 531, 532).

It is true that there was medical testimony tending to show that plaintiff might engage in some form of sedentary employment, and therefore was not totally disabled, but it is equally true that one of the medical experts testified that it had been his experience that "men who have been hospitalized as many years as this man has *are never any good for any kind of occupation.*" (Italics our own.) With all this evidence, the court held that the case was properly one for the jury, and it seems to us that it would have been error to have held otherwise.

Courts often experience great difficulty in determining whether a given case should be left to the decision of the jury or whether a verdict should be directed by the court. Fortunately, however, the rule in this circuit has been definitely settled and almost universally observed. Judge Gilbert, for many years and until recently the distinguished senior judge of this court, whose gift for expression was unsurpassed, has stated the rule as follows:

"Under the settled doctrine as applied by all the federal appellate courts, when the refusal to direct a verdict is brought under review on writ of error, the question thus presented is whether or not there was any evidence to sustain the verdict, and whether or not the evidence to support a directed verdict as requested, was so conclusive that the trial court in the exercise of a sound judicial discretion should not sustain a verdict for the opposing party.

"And on a motion for a directed verdict the court may not weigh the evidence, and if there is substantial evidence both for the plaintiff and the defendant, it is for the jury to determine what facts are established even if their verdict be against the decided preponderance of the evidence. Travelers' Ins. Co. v. Randolph, 78 F. 754, 24 C. C. A. 305; Mt. Adams & E. P. Inclined Ry. Co. v. Lowery, 74 F. 463, 20 C. C. A. 596; Rochford v. Pennsylvania Co., 174 F. 81, 98 C. C. A. 105; United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; Smith-Booth-Usher Co. v. Detroit Copper Mining Co., 220 F. 600, 136 C. C. A. 58. In the case last cited this court said:

" 'The right to a jury trial is guaranteed by the Constitution, and it is not to be denied, except in a clear case. The foregoing decisions, and many others that might be cited, have definitely and distinctly established the rule that if there is any substantial evidence bearing upon the issue, to which the jury might properly give credit, the court is not authorized to instruct the jury to find a verdict in opposition thereto.' " United States Fidelity & Guaranty Co. v. Blake (C. C. A.) 285 F. 449, 452.

Again, "such an instruction would be proper only where, admitting the truth of the evidence for the plaintiff below, as a matter of law, said plaintiff could not have a verdict." Marathon Lumber Co. v. Dennis, 296 F. 471 (C. C. A. 5).

See, also, the following recent decisions of this court: U. S. v. Barker (C. C. A.) 36 F. (2d) 556; U. S. v. Meserve (C. C. A.) 44 F. (2d) 549; U. S. v. Rice (C. C. A.) 47 F.(2d) 749; U. S. v. Stamey (C. C. A.) 48 F.(2d) 150; U. S. v. Lawson (C. C. A.) 50 F.(2d) 646.

It is also contended that the court erred in refusing to give one of defendant's requested instructions, but the record shows that, when the matter was brought to the attention of the court, the latter stated that the request had been given in effect, and proceeded to repeat the same in language that could not have been misunderstood. The comments made by the court in connection therewith were not prejudicial.

A trial judge is not a mere automaton. He is not required by law to employ the identical language set forth in the requested instructions, and under proper circumstances and in the interest of justice may explain, qualify, or modify any such instructions, provided, of course, that he correctly states the law and the complaining party is accorded the right of review.

"It is an established rule that a court of the United States, in submitting a case to the jury, may call their attention to parts of the testimony, provided the court clearly instructs the jury that they are the sole judges of the facts, and that no rule of law is incorrectly stated." Ross v. McLean, 56 App. D. C. 62, 10 F. (2d) 627, 629, and cases therein cited.

We think that the charge as a whole is fair and free from error.

The judgment is affirmed.

WILBUR, Circuit Judge, concurs.