### UNITED STATES v. McLAUGHLIN.
### No. 9050.

Circuit Court of Appeals, Eighth Circuit.
Nov. 2, 1931.

Charles E. Sandall, U. S. Atty., of Omaha, Neb. (Robert Van Pelt, Asst. U. S. Atty., of Lincoln, Neb., and Ambrose C. Epperson, Edson Smith, and Lawrence I. Shaw, Asst. U. S. Attys., all of Omaha, Neb., on the brief), for the United States.

C. Frank Reavis, of Lincoln, Neb. (Edward F. Fogarty and Richard Wood,. both of Omaha, Neb., and G. E. Price, of Lincoln, Neb., on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and YOUMANS, District Judge.

YOUMANS, District Judge.

Appellee, who will hereafter be referred to as plaintiff, enlisted in the United States Army on December 14, 1917, and was discharged on March 1, 1919. During that period he took out a policy of war risk insurance for $10,000 on which he paid premiums monthly up to and including the month of April, 1919. The payment of the April premium continued the policy in force until May 31, 1919. This suit was brought December 11, 1929.

Plaintiff's complaint contains the following allegation: "That the plaintiff was stricken with influenza while in the service of the United States Government and as the result of said influenza became totally and permanently disabled, and was so disabled at the time of his discharge from the United States Army. That by reason of these facts the policy of War Risk Insurance issued to the plaintiff had matured under the law on May 31, 1919."

The answer denied that the plaintiff became totally and permanently disabled during the period the policy was in force. As a result of the trial, there was a verdict for plaintiff, and judgment was rendered for him. The United States appealed.

The evidence shows that the plaintiff had influenza while in the army, and that while stationed near San Antonio, Tex., he was sent to the hospital. Later he was discharged from the hospital, and was given a furlough. He spent his furlough at the home of his parents at Havelock, Neb. He returned to the service in the fall of 1918, and remained in the service until his discharge.

The plaintiff testified as follows: "I returned to Havelock immediately upon my discharge. As to my physical condition at the date of discharge, I was tired and exhausted. I laid off ten days after my discharge before going to work, and then I went to work at the Chicago, Burlington & Quincy Railroad shop at Havelock. I was able to do my work in good shape. I managed to do it. I experienced difficulty in doing the same amount of work that I had been able to do before I went into the army. I found that I became exhausted too easily and had to rest frequently while at work. My condition did not improve at any time. I didn't get worse to amount to anything until I had my breakdown. The breakdown I refer to is the one my father testified about this morning, in March, 1920. Before my breakdown I didn't feel sick, I felt tired and exhausted. As time went on I felt more tired and more exhausted, and that kept increasing until I had my breakdown."

The chief clerk of the shops at Havelock, testified for plaintiff as follows:

"I have supervision of the records covering the employment of Edward McLaughlin, the plaintiff in this case, and I have a transcript of some of them. These records show that he entered the service the first time on June 3rd, 1913, as a boiler maker's apprentice. He stayed then until August 21, 1913, when he resigned to go to school. His service record was good. He was employed there after that in July, 1914, as a messenger, and he stayed there in various occupations until March 26, 1917. He had various jobs in a clerical capacity, as boiler shop clerk. April 1, 1915, he was promoted to boiler shop clerk. The records show his other promotions as follows: Labor Distribution Clerk, April 14, 1916. He continued on that until June 1, 1916, when he was promoted to Material Distribution Clerk; February 19, 1917, he was promoted to Assistant Time Keeper and then he resigned March 26, 1917, with a service record good. He came back after that and resumed on October 16, 1917, as a machinist's helper. Then he resigned on December 12, 1917, to join the service. I have the records of his employment after his service in the World War. He resumed on March 10, 1919, as a machinist at 50¢ an hour, October 1st, 1919, increased to 54¢; he was given an increase January 1, 1920, to 57¢ per hour, he was increased May 1st, 1920, to 70¢ per hour; and increased January 15, 1921, to 74¢ per hour, all of which time he was in the service as a machinist. That is the final date of increase.

"With reference to the time lost by Edward since the war, I brought the sheets of our time rolls, but these records are quite old and I haven't been able on short notice to get all of them. I have what I could get. The first one is March 1, 1919, when he entered the service. That is for the whole month. He lost one day in that month. The next month I have is April, 1919. He lost one day. The shops worked only 5 days a week, we wasn't working Saturdays. The next month I have is May, 1919, shops working 5 days then. He lost half an hour the first day, he lost the 14th, that is all for that month. The next month I have is June, 1919. In that month he lost the 7th, 16th, 17th, 18th, 19th, 20th, and 21st, six days all told. July is the next month. He didn't lose any days; he

lost one hour in that month. That month he drew $103.50. The next month I have is August, 1919. He lost no time during August. The next one I have is September, 1919. He lost that month. The next I was able to get was November. Some of our records are in the main office in Chicago, and I haven't been able to get them. In November he lost one-half hour. The 'next month I have is January, 1920. There was no time lost. The next month is February, 1920. No days off during February. That was all I was able to get on short notice. I took these right out of our original time rolls. This man has been physically unable to work since April, 1921, according to our records. He made that decision himself by not showing up for work, that is the last day we have a record of him working. His records show his behavior has been good. His records are all good. These records show that in March, 1919, he earned $72.00; April, 1919, $88.00; May, 1919, $79.75; June, 1919, $72.00; July, 1919, $103.50; August, 1919, $104.00; September, 1919, nothing; November, 1919, $119.64; January, 1920, $143.64; February, 1920, $126.82."

On cross-examination this witness said: "These are the only records I have of Mr. McLaughlin's employment, and our records show that since the war the plaintiff worked from March 10, 1919, and his last work was some time in April, 1921."

Plaintiff introduced his rating sheet showing the rating given him by the Veterans' Bureau as follows:

"Temporary Partial less than ten per cent from discharge to 3-23-20. (Examined by Dr. Williams)

"Permanent total from 3-23-20 to 1-1-29.

"Double Permanent and Total from 1-1-29 (Section 202 (3) W. W. V. Act, 6-7-24).

"Held as incurred in or aggravated by service under the terms of the second proviso, section 200, World War Veterans' Act, 1924."

The evidence shows that plaintiff had an acute attack of encephalitis in March or April, 1920.

After that attack, plaintiff developed a disease called Parkinson's disease from which he was suffering at the time of the trial.

At the conclusion of all the testimony, the attorney for the government moved the court to direct the jury to return a verdict for the defendant, which motion was by the court overruled, and the attorney for the government excepted. That action of the court is assigned as error.

"In determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of the latter all the inferences that fairly are deducible from them." Gunning v. Cooley, 281 U. S. 90, 94, 50 S. Ct. 231, 233, 74 L. Ed. 720.

The essential fact necessary to be covered by the evidence was the existence of total and permanent disability at the time the policy lapsed, which was May 31, 1919. There was abundant evidence of total and permanent disability at the time of the trial, and for some time preceding. That, however, was not sufficient. While it is not necessary to show the exact time such disability began [United States v. Scott, 50 F.(2d) 773, 774 (C. C. A. 6)], it is necessary to show that it existed while the policy was in force, before it lapsed. It is alleged in the complaint that such total and permanent disability existed before the policy lapsed. It was necessary so to allege, and so to offer proof before there could be a recovery under the contract sued on. Among the many cases so holding in this court, are United States v. Le Duc, 48 F.(2d) 789, 791, 793, and Blair v. United States, 47 F.(2d) 109, 110; and in other circuits: United States v. Lawson, 50 F.(2d) 646, 650, 651 (C. C. A. 9); United States v. Tyrakowski, 50 F.(2d) 766, 767, 768 (C. A. A. 7); United States v. Burke, 50 F.(2d) 653, 655, 656 (C. C. A. 9); United States v. Scott, 50 F.(2d) 773, 774 (C. C. A. 6); Kelley v. United States, 49 F.(2d) 896, 897, 898 (C. C. A. 1); Ross v. United States, 49 F.(2d) 541, 542 (C. C. A. 5); Carter v. United States, 49 F.(2d) 221, 222 (C. C. A. 4); United States v. Searls, 49 F.(2d) 224 (C. C. A. 4); United States v. Harrison, 49 F.(2d) 227 (C. C. A. 4).

The evidence fails to show any total and permanent disability on or prior to May 31, 1919, the date of lapse of the policy. It tends to show such disability in March, 1920. It tends to show such disability resulted from the flu before the discharge. It also shows that the encephalitis and ensuing Parkinson's disease are of germ origin. There is no evidence at all that the germ condition (supposed to have originated from the flu) had so progressed as to produce the encephalitis before or by the 31st of May, 1919, nor that plaintiff's work after that time had aggravated or in anywise affected the progress of the disease. The most that can be said of the evidence is that the cause of subsequent dis-

ability arose during the service, and, it may be fairly presumed, progressed in intensity until total and permanent disability resulted in March, 1920, about ten months after the lapse of the policy.

Plaintiff's testimony falls short of proof that such disability existed on May 31, 1919, and the burden was on him to offer such proof. United States v. De Armond, 48 F. (2d) 465 (C. C. A. 8); Blair v. United States, 47 F.(2d) 109 (C. C. A. 8).

This case is one where the present total and permanent disability is strongly established, and we are inclined to indulge every proper presumption in favor of recovery; but we can find no basis for presuming that this complete disability existed on May 31, 1919, when the substantial evidence goes no farther than showing its existence in March, 1920. Under prior holdings of this and other courts, and the most favorable view of this evidence which we are permitted to take, we are forced to conclude that there is no evidence of the essential fact that this disability existed before or on May 31, 1919.

The judgment must be reversed, and the case remanded for a new trial.