## SLOCUM v. UNITED STATES.
### No. 5078.

District Court, D. Massachusetts.

Dec. 22, 1932.

Joseph G. Schumb, of Boston, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty., by John Lawrence Hurley, Sp. Asst. U. S. Atty., both of Boston, Mass.

BREWSTER, District Judge.

This is a suit to recover the benefits of a policy of war risk insurance for $10,000, issued December 1, 1917. The policy was later converted, but the plaintiff in this proceeding seeks to recover on the original term policy, alleging that he became totally and permanently disabled in 1918 when that policy was in force.

The plaintiff graduated from the University of Maine and received a degree of Bachelor of Philosophy in mechanical engineering at Yale. While in New Haven he entered the air service in 1917, and soon after was commissioned First Lieutenant of the Signal Reserve Corps, Aviator Section. In June, 1918, he went overseas to England and France, where he was attached to the Royal Air Service. Before leaving the United States he had sustained two minor injuries. One of them was an injury to the neck, resulting from a fall in an airplane.

In August, 1918, while aerial bombs were being dropped in the vicinity of the airdrome in France where the plaintiff happened to be, one of the bombs exploded so near that the force of the concussion moved him along the ground as he was lying face downward. He says that he was dazed and suffered as a consequence severe pain in the neck, back, and arms, especially when standing. He received no hospitalization or treatment for this injury while in France. He carried on his duties to the best of his ability, but found that standing or walking, or any physical exertion, brought on intense pain. Shortly after this event he went to England, where he remained over two months with no improvement in condition. He was then granted leave to return to the United States. Upon his arrival in the United States, he immediately went to the Walter Reed Hospital in Washington, D. C. While at this hospital he was advised to try a Thomas collar as a means of relief, but this experiment was not satisfactory, and he was then furnished a Taylor brace, which did alleviate to some extent the pain. He entered this hospital January 10, 1919, and was discharged January 16, 1920. He then returned to duty doing only desk work at Washington, but at the end of six months he experienced a complete nervous breakdown and was discharged from service on July 2, 1920. It was thought that a complete rest and treatment for his neurotic condition would be beneficial. He spent two or three months on an island on Sebago Lake, Me., and then went under the care of Dr. Austin F. Riggs at Stockbridge, Mass., for five or six weeks. In December, 1921, he was examined by doctors connected with the Veterans' Bureau at Portland, Me., who advised an operation, and he was sent to the Parker Hill Hospital in Boston for that purpose. He was at the Parker Hill Hospital from January to May, 1922, but no operation was performed. Instead, a new type of brace, with collar attached to support the head, was devised. From that time up to the present he has almost constantly worn a brace and collar of this type. He was an out-patient of the hospital for two or three months after his discharge in May, 1922.

In October, 1922, he was before a board of physicians in Portland, Me., for examination, and again on March 9, 1926. Following this latter examination he went to a hospital in Washington for a few months, where an unsuccessful experiment was made to see if it would be possible to dispense with the brace.

On May 1, 1929, he submitted to an examination conducted by the board of physicians connected with the Boston office of the Veterans' Bureau.

In 1927, 1929, and 1931 he was elected to the State Senate of the State of Maine. The election was for a two-year period. The sessions averaged about sixteen weeks each, and he received for the first two years $400 and for each of the other two terms $600. With his salary were certain small amounts allowed for travel and postage. He was able to attend the sessions with reasonable regularity, but he found his duties as legislator at times required more mental exertion than he could give without detriment to his health. His nervousness increased and a day's work left him irritable and fatigued.

Since the date of his discharge the only income which he had received from his own endeavors consisted of the fees which he received as inspector of aircraft and as examiner of pilots for the state of Maine, which did not amount to more than $50 to $75 annually and his emoluments as State Senator.

With the exception of the periods at hospitals and an occasional visit in the winter to his father in New York, he has spent the

greater part of his time at the island on Sebago Lake, living alone in a cottage which he owns there. He owned a motorboat and an automobile, both of which he was able to run himself, and he did some entertaining; but for the most part he lived a quiet and uneventful life on the island.

This case presents the familiar question whether the insured was totally and permanently disabled while the insurance was in force. It presents, however, some unusual aspects of that old question.

With the exception of his work as senator and aviation inspector, he has engaged in no gainful employment whatever. I do not think it could be seriously urged that he has, in fact, carried on continuously any substantially gainful occupation, and I so find. But this is not conclusive. Hobin v. United States (D. C.) 59 F.(2d) 224. Compare Proechel v. United States (C. C. A.) 59 F. (2d) 648.

I am further satisfied that the plaintiff is controlled by the honest conviction, resulting from his experiences since his return to the United States, that he is not able to take up any work involving physical or mental exertion and carry it on with reasonable regularity. I have no doubt that he has a genuine belief that he could not take up again the work of instructor in mechanical engineering, an occupation which he had followed prior to his enlistment. I also rule out any idea of malingering because, apart from the difficulty in deceiving so many specialists for so long a period of time and the annoyance and inconvenience of wearing an 8-pound brace continually, it is inconceivable that one with the educational background and intelligence of this veteran would deliberately choose a life of comparative invalidism when a life of activity held out much the greater promise of monetary reward.

The real question here is whether one who has thus allowed his disabilities to so far govern his attitude toward employment that none has been seriously sought or entered upon can be deemed to be totally and permanently disabled within the terms of the contract. The answer to this question turns upon the extent of the real infirmities, physical and mental; justification for the neuro-mental condition and the chances of recovery. A careful consideration, therefore, of the medical evidence in the case becomes of more than ordinary importance.

It appears from the records of the Walter Reed Hospital that a definite functional condition was found, but no evidence of organic trouble. The diagnosis was posterior radiculitis sixth cervical to seventh dorsal segment. Psychoasthenia evidenced by introspective morbid fear, difficulty in concentration, and fatigability on mental application. At this hospital an X-ray was taken, but it was negative, revealing no abnormalities. The treatment there was physiotherapy and hydrotherapy.

He was next diagnosed by Dr. Riggs as a war neurotic. It appears from Dr. Riggs' report that he was examined by the Veterans' Bureau at Pittsfield, Mass., which found compression fracture of the third dorsal vertebra. He was next examined at Portland, Me., in December, 1921, where his case was diagnosed as "probable compression fracture of the 3rd dorsal vertebra and hysteria traumatic." At this time an X-ray was taken, the roentgenologist reporting that the third thoracic vertebra "does not look normal." Whether it was an old fracture he was unable to state.

The next diagnosis was made at the Parker Hill Hospital, where they found he was suffering from chronic arthritis (traumatic) of dorsal spine (third to tenth). While at this hospital two X-rays were taken showing, according to the report, that the intervertebral discs of the third to eighth dorsal were cloudy, the condition being especially marked between the third, fourth, and fifth vertebræ where narrowing of the intervertebral space was discernible. There was no evidence of either bone destruction or proliferation, the report adding that "these changes are rather suggestive of a simple arthritic process of long standing."

In October, 1922, the veteran submitted to an examination before five doctors in Portland who concurred in the following diagnosis: "Traumatic arthritis and traumatic neurosis." The X-ray taken at this time also revealed that the same intervertebral spaces were "hazy." The roentgenologist diagnosed traumatic arthritis of the third, fourth, fifth, and sixth dorsal vertebræ. It is significant that this board then regarded the plaintiff as entitled to a rating of total and permanent disability.

Substantially the same diagnosis resulted from the examination of March 9, 1926, when he was again X-rayed, the report showing that the intervertebral spaces of the third and fourth, fourth and fifth, fifth and sixth, are narrowed and denser than usual. No evidence of injury to the bodies of the vertebræ. There was some bridging of the left margins of the bodies of the eighth, ninth, and tenth and lipping of the anterior margins of the

fifth, sixth, seventh, and eighth vertebræ. The X-ray findings, according to the report, indicated chronic arthritis of the dorsal spine.

Apparently at this time the board recommended further hospitalization, and the veteran entered the Veterans' Hospital at Washington, where he was subjected to a very thorough examination into his physical and mental condition. The examination resulted in the following diagnosis:

Major: "Neurosis, traumatic, severe, cervico-dorsal in type."

Secondary: "Arthritis, slight, dorsal spine, 5th and 6th vertebræ (symptomatic)."

The X-ray taken at the hospital disclosed a normal condition, except that an X-ray of the thoracic spine showed slight angulation, the intervertebral disc between the fifth and sixth vertebræ being slightly thinner on the left than on the right.

In 1929, he underwent two examinations, one in May and another in November, conducted by doctors in Boston. The May examination resulted in a diagnosis of contusion of the spine, healed, traumatic neurosis, hysterical type "which because of his unhealthy neuro-mental make-up constitutes total temporary disability." At this examination the physicians had the aid of an X-ray taken at the time. According to the testimony the results were negative.

In November, he was examined by Dr. Goldthwaite, of Boston, an eminent orthopedic, to whose report I shall refer more fully later.

These records of hospitals and reports of doctors representing the Veterans' Bureau lead inevitably to the conclusion that the plaintiff sustained a definite physical injury to the spine while in the service. Whether the injury was caused by his fall in an airplane and aggravated by the exploding bomb, or whether his physical injury had its sole origin in the later occurrence, is not material. From plaintiff's testimony and that of his witnesses, I am persuaded that the results of the injury have been and still are constantly present to a greater or less degree. An arthritic condition resulted to a portion of his spine, diagnosed as traumatic arthritis. These results have been attended by pain about the back, shoulders, and neck, which is accentuated whenever he undertakes to go about without his brace.

It is equally apparent that the intense suffering following the injury in France, added to his war experiences, brought on a complete nervous breakdown in 1920. While to some extent he has been able to subdue his fears and apprehensions, he has by no means fully recovered from the functional nervous disorder. No doubt hysteria contributes to his disability by exaggerating symptoms, but this exaggeration cannot be disregarded in determining the extent of the disability. This mental condition, according to Dr. Goldthwaite, is a natural sequence of the treatment the plaintiff has undergone since his return to the United States. I quote from a letter written by Dr. Goldthwaite to General Hines under date of November 15, 1929 (admitted without objection):

"Quite apart from the physical condition is, of course, the mental condition of the patient who, naturally, as the result of the long continued treatment and the many examinations, distorts some of the symptoms and has, naturally, lost his confidence in his recovery. This does not mean that he is intentionally magnifying symptoms but the mental picture in a condition of this kind must be reckoned with in the treatment of the patient quite as much as the physical. * * *

"If he were to be under my care, he would have to be at the Corey Hill Hospital, temporarily, but that means more expense than the Bureau is willing to allow, as I understand the situation. Such in general is my opinion, in the first place that the man has a very real difficulty, with a distorted mental state which is to be expected rather than wondered at but that neither condition is irreparable if proper handling is possible."

As one of the witnesses puts it: "There is no reason to believe he (plaintiff) is not truthful. There are underlying reasons that go with a mental attitude toward illness. A person may be perfectly honest and yet have a mental attitude that is quite as incapacitating" (as physical injury).

In fact, the government at one time acknowledged its liability under the original policy by paying the stipulated installments up to 1926, when payment was discontinued.

Dr. O'Brien, a neuro-psychiatrist, called by the government, regarded the plaintiff as totally disabled as late as 1929 when his condition was no worse than it was while the policy sued upon was in force. I concur in this conclusion. Elbag v. United States (D. C.) 48 F.(2d) 281; United States v. Burke (C. C. A.) 50 F.(2d) 653; Madray v. United States (C. C. A.) 55 F.(2d) 552; United States v. Scarborough (C. C. A.) 57 F.(2d) 137; United States v. Irwin (C. C. A.) 61 F.(2d) 488.

I find that the plaintiff became totally dis-

abled, within the meaning of the contract of insurance, while the original policy was in force, and that such total disability has continued down to the time of trial. See Bartee v. United States (C. C. A.) 60 F.(2d) 247.

The only remaining question to be considered is whether the disability is to be deemed permanent within the purview of the regulation which provides that a total injury shall be deemed permanent when it is "founded upon conditions which render it reasonably certain that it will continue throughout the life of the person suffering from it."

The evidence discloses a desire on the part of the plaintiff to follow recommendations of the several doctors and to pursue any rational course that might open a possible road to rehabilitation. Apparently at first he entertained a belief that he might overcome his handicaps, but his inability to do so after years of rest, after all the medical advice, treatment, examinations, and hospitalization, has reduced his confidence nearly to the vanishing point. Dr. Goldthwaite, in 1929, suggested that if the plaintiff could take a course of treatment, which the government is either unwilling or unable to give, a substantial cure might be effected; but nothing along this line has since been attempted, and I can see no ground for deeming the disability to be only temporary. See United States v. Gower (C. C. A.) 50 F.(2d) 370.

In conclusion, I find and rule that the plaintiff is entitled to recover in this action on the ground that he became totally and permanently disabled on the date of his last injury, sustained while in the service, to wit, August 27, 1918, and judgment according to law may be entered in favor of the plaintiff on his petition, the form of such judgment to be submitted by counsel.