### SORVIK v. UNITED STATES.
### No. 6402.

Circuit Court of Appeals, Ninth Circuit.
Sept. 2, 1931.

B. W. Oppenheim, J. M. Lampert, and J. B. Musser, all of Boise, Idaho, for appellant.

H. E. Ray, U. S. Atty., and Ralph R. Breshears, W. H. Langroise, and Sam S. Griffin, Asst. U. S. Attys., all of Boise, Idaho, for the United States.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment on a directed verdict in favor of the government in an action on a policy of war risk insurance. Appellant entered the military service of the United States June 22, 1918, and was honorably discharged February 3, 1919. His policy lapsed for nonpayment of premiums October 31, 1919. Appellant alleged in his complaint that while the policy was in force and effect he became permanently and totally disabled by reason of having contracted bronchial asthma. The ruling of the trial court in determining that the evidence was insufficient as a matter of law to sustain a judgment for appellant and in directing a verdict for the defendant is the only issue on this appeal.

Appellant testified in substance as follows: On his way overseas in September, 1918, he contracted influenza and tonsilitis. Upon his arrival in England he was sent to a hospital, where he remained until December, 1918, when he was sent back to the United States. Upon his return he was again placed in a hospital and treated for the same ailments from which he suffered overseas. He remained in the hospital until the time of his discharge in February.

Considerable medical testimony was introduced at the trial, part of it of a vague and conflicting nature. In granting the government's motion for a directed verdict, the trial court seems to have based its action chiefly upon the insufficiency of the testimony of the two physicians who testified for the plaintiff. In this connection, the court said: "Dr. Hagen, who examined him [the plaintiff] in the spring of 1919, did not give his opinion that the plaintiff was at that time suffering from bronchial asthma, which would result in his being permanently and totally disabled, and prevent him from following continuously any substantially gainful occupation, (or founded upon conditions which would render it reasonably certain that his disability would continue throughout the remainder of his life.) As to the testimony of the other physician, Dr. Woods, who did not see the plaintiff or make an examination of him until shortly before the trial, he is the only one who expresses an opinion that the plaintiff was, at the time of the examination made by Dr. Hagen, permanently and totally disabled by reason of having at that time bronchial asthma. In other words, Dr. Woods bases his opinion as to whether he was suffering from bronchial asthma at any time during the life of the policy upon the hypothetical question propounded to him, which included the examination made of the plaintiff by Dr. Hagen."

In addition to the expert testimony, however, considerable evidence was presented by lay witnesses, including the plaintiff himself. We will now examine this lay testimony in some detail, for the purpose of ascertaining whether or not, in connection with this medical testimony, it did not warrant submitting the case to the jury.

Sorvik was discharged from the army on February 3, 1919. His work history since his discharge commenced on April 26, 1919. Below we give excerpts from his testimony as to his intermittent employment, together with side references to the testimony of other witnesses where such testimony can shed light upon the plaintiff's own evidence:

"I went home, ran short of money and I thought I might make it by going up to my brother-in-law at Binford, North Dakota, W. G. Tweed. I worked for him about a week or two at carpenter work, that being the type of work I followed preceding my

entrance into military service. I had to quit that work, my chest was bothering me, the pains and shortness of breath and this dizziness, and the pains really drove me off the job. * * *

"I went back home to my father's house, at that time having no home of my own, but before going to my father's home I borrowed some money to see if I could get some medical aid and part of that I used up on my insurance policy. * * * I then tried the rest cure again and was home practically all summer and then went back to my brother-in-law and stayed at his home visiting for a while, but did no work. I tried to help around my father's home, but I was not able to do any heavy work or exert myself to any extent. * * *

"I then went back to Lake Park, Minnesota, and stayed home there for a while. This being the fall of 1919. I did not do anything except small things around home, like help choring. We had a couple of cows there and two horses and I would do the milking there at times through this following winter. I tried to do manual labor or hard work, but was not able to do such work. I would get those spells of coughing and shortness of breath and if I exposed myself to the winter, or damp air, I would get those pains in my chest so I thought I would just rest as long as I could and probably I would get over that. So I did not try any work then for quite a while, until about the spring of 1920. * * *

"I started away from home the next time April or May, 1920, and went to Juanita, North Dakota, having received a letter from my brother, who gave me employment, he having one or two contracts of building. I supervised the construction of these houses, continuing in that type of labor practically all that summer until about October. During that time I called on two or three physicians. * * * About the first of November, 1920, I got married and went to Crosby, North Dakota, from there I wanted to go west here somewhere to see if a change of climate would help my condition and I was intending to go to Colorado, but I did not, we went to Spokane, Washington. I there tried to get some kind of work, and I did get work at the Clemmer Theater, as a janitor, I worked at that about a month. I was discharged from that job because I could not take care of the work. I was bothered whenever I got into dust, it would get my breath and there was a lot of dust in that work. The dust got my breath and I had to lay off until I got my breath back, that is, get out of the dust and get out in the air. I did not do anything then until about April, 1921, when I went to Coeur d'Alene, Idaho. * * * From October, 1920, to this time in April, 1921, the condition of my health as to these symptoms heretofore described were the same with these spells I had and I had night sweats and pains in my chest and that dizziness and during all of that time the symptoms so far as I could observe them was about the same during that entire period of time as they were back there at the time I saw Dr. Hagen in 1919.

"I then resided in Coeur d'Alene until 1926. There I got a job at some house the Rutledge Lumber Company was building. I worked there about a month, when we were all laid off there, and I found it was hard for me to get away with the work, at times I would get weak, in the afternoons especially, weak and nervous and shortness of breath at the same time. So I thought I would get some contracts like I did in North Dakota. I struck a job at the Fort Grounds. I landed a house on contract. I did that job and then not having anything else I tried to get a job with the other carpenter on the house to help finish and did get a job at that. I first started to clean out the house and the plaster on the floor, and I got into the dust again and had to lay off for a couple of days. Then I came back on the job again. After that job I got some contracts. Small contracts around town. Continuing at that type of work throughout my residence in Coeur d'Alene. About a year or two after coming to Coeur d'Alene I started a little grocery store up close to my home. I thought I would get away from this carpenter work if I could but the store did not quite make our living, so I had to get out and do carpenter work between times. My wife took care of the store most of the time. * * *

"I did nothing during the fall of 1926 or the following winter and in the spring of 1927 I did some cabinet work inside. In working at the carpenter work the exertion would catch me, the shortness of breath, etc.

"In the spring of 1927 I went to Kellogg, got a job with the carpenters on the zinc plant down there, worked three days and was discharged, being made to understand that I could not hit the ball, or do what the rest of them did. We were building a roof at the time. I was quite high and these dizzy spells would bother me when I got up. I would lose my balance once in a while, especially standing. I have lost my balance lots of times and fell off. Follow-

ing that particular employment I went into town and got a job from Gilbert Nokes doing carpenter work. He was building a house there and I continued to work for him from the spring of 1927 until the fall of 1929 in October I believe. I also had one little job on my own hook and I started a little shack for myself at Kellogg."

In this connection, it is well to observe that Nokes, a government witness, testified he paid Sorvik $279.15 in 1927-1928 and $348.31 in 1929. Nokes said that Sorvik worked eight-hour shifts, at $1 an hour. On this basis, the plaintiff was employed by Nokes for about 78 days during that two-year period.

"While at Kellogg I called on Dr. Mc-Dougal, who helped me make out an application to go down to the Boise Veterans' Hospital for treatment, that was in December, 1928. I was informed the hospital there was filled up and they could not take care of me, and they finally called for me in April, 1929. I went to the hospital and remained there about a month and sometime in May came out of the hospital at Boise and went back to Kellogg, Idaho, and I then did some carpenter work again, not steady day after day. I got a little job of my own there. I done a little wood shed for a fellow and then I was on with Nokes off and on. The symptoms and spells or spasms I had at the time of the treatment by Dr. Hagen I had them regular about the same as I did when I saw Dr. Hagen throughout the period of my residence at Kellogg, Idaho, and just about as frequently throughout the entire period of time. During the time that I was at Kellogg, I had no other source of income or earning other than that which I myself earned through this labor that I have been referring to, and compensation that I was getting from the government. During the time I was at Kellogg I had some income from my wife's taking in washing and roomers in our home and she worked at a boarding house.

"In October, 1929, I went to Lake Park, Minnesota, and remained there until May, 1930, and during that time did not work at all. I was not able to work. I had pains in my chest, I had night sweats right along and the spasms I would have with coughing and shortness of breath. * * *

"In the spring of 1930 I left Lake Park, Minnesota, and went to Seattle, Washington, and then to Aberdeen, Washington, where I worked about a week and a half or two weeks doing carpenter work, and then to Port Angeles, Washington, where I have been working off and on at carpenter work up to the present time. And during that period of time from about April, 1930, to the present time my physical condition has been just about the same. I would be laid up once in a while with these spasms just the same right along as they were before, *and so far as I was able to observe there was no material difference at any time since the army service to the present time as to the symptoms that I have described.*"

The plaintiff offered expert testimony tending to show that total and permanent disability occurred during the life of the insurance policy, which lapsed October 31, 1919. Examining the plaintiff's expert testimony, we find the following:

Dr. C. J. Hagen testified that he treated Sorvik in the spring of 1919.

"The condition of his chest was that of * * * what is termed bronchitis, with dyspnoea, that is difficulty in breathing: for instance, he would be out of breath from exertion; that he was rather underweight and appeared in a general undermined condition."

"He came to me at Fargo, N. D., again in October, 1929, at which time I again treated the plaintiff. * * * And the condition of the patient at that time when he had this bronchial spell was that he had difficulty in breathing and coughing and what we call dyspnoea, which means difficulty in breathing in and out, the breath is sort of held within the bronchial tubes, as spasms. These spasms are usually recurrent in patients such as Mr. Sorvik with the condition I found him in in 1919 and 1929."

"Going back to my examination of the patient in 1919, and describing the asthma condition I found at that time I would say that the condition of bronchial asthma is a spasm of the bronchials, that is the smaller bronchial tubes, and is due to an irritation of the lining of these bronchial tubes."

"I think the condition in 1919 was more severe than when I saw him here in 1929, but the type is just the same; that is, the bronchial asthma type is always the same character, only differs in intensity so a person may be laid up two or three months with bronchial asthma and another may only be laid up a week. * * * *"

In answer to a hypothetical question, Dr. John T. Woods, also testifying for the plaintiff, said:

"Taking everything into consideration as you have stated, I should say that he is totally disabled."

"Q. And would it be the best that science can determine to say that he is permanently disabled under the definition I have heretofore given you as to permanent disability, reasonable expectation, and so forth? Shall I read that, or do you have it in mind? A. No, I have it in mind. It is most likely.

"Q. It is your best opinion that it will be permanent? A. Yes, sir.

"Q. Do I understand, Dr. Woods, that it is your best judgment that he has been totally and permanently disabled since and ever since the attack of the flu or influenza during his army service and on or about December, 1918? * * * A. * * * I think he was disabled from the time he saw Dr. Hagen. [The first time.]"

■ Insufficient as the foregoing evidence, both lay and expert, may seem to some students of the record, it can hardly be said that there was no substantial evidence to sustain a verdict for the plaintiff, had such a verdict been brought in by the jury. The test to be applied in such a case, of course, is not whether the evidence brings conviction in the mind of the trial judge; it is "whether or not the evidence to support a directed verdict as requested, was so conclusive that the trial court in the exercise of a sound judicial discretion should not sustain a verdict for the opposing party." United States Fidelity & Guaranty Co. v. Blake (C. C. A. 9) 285 F. 449, 452, and cases there cited; and United States v. Burke, 50 F.(2d) 653, decided by this court June 1, 1931, and cases there cited.

■ And in measuring the quantum of evidence necessary to sustain a possible verdict for the plaintiff, we must bear in mind the remedial purposes of the World War Veterans' Act (38 USCA § 421 et seq.), which the courts have repeatedly held should be liberally construed in favor of the veterans. United States v. Eliasson (C. C. A. 9) 20 F.(2d) 821, 824; United States v. Sligh (C. C. A. 9) 31 F.(2d) 735, 736, certiorari denied 280 U. S. 559, 50 S. Ct. 18, 74 L. Ed. 614; United States v. Phillips (C. C. A. 8) 44 F.(2d) 689, 692; Glazow v. United States (C. C. A. 2) 50 F.(2d) 178.

■■ Quite aside from the conflicting medical testimony, the plaintiff's own testimony on the stand would tend to establish that he is totally and permanently disabled from following "continuously any substantially gainful occupation." As has been often said by the courts, the term "total and permanent disability" "obviously does not mean that there must be proof of absolute incapacity to do any work at all. It is enough if there is such impairment of capacity as to render it impossible for the disabled person to follow continuously any substantially gainful occupation." United States v. Sligh, supra; United States v. Eliasson, supra; United States v. Rasar (C. C. A. 9), 45 F.(2d) 545, 547; United States v. Godfrey (C. C. A. 1) 47 F.(2d) 126, 127; O'Hora v. United States (D. C. Pa.) 49 F.(2d) 945, 946; United States v. Lawson (C. C. A. 9) 50 F.(2d) 646, decided by this court on May 18, 1931, and cases there cited.

■ In the instant case, it is clear that Sorvik, because of his educational limitations, was not equipped for office work. It is likewise clear, from the foregoing excerpts from the transcript, that he made repeated manful efforts to earn his living, and that on several occasions he had to give up plying the only trade he knew—i. e., carpentry—because of its deleterious effect upon his health, due chiefly to the dust. It is true that occasionally he did stop work because there was no work for him to do; but this fact cannot lead to a presumption that he would have been able to work steadily had work been available, in the face of the affirmative evidence that on more than one occasion he was forced to give up his employment because of his asthmatic condition.

In their criticism of the plaintiff in this respect, counsel for the government are somewhat inconsistent. Thus, early in their brief, they say: "He testified * * * that he has been doing contracting work most of the time, and that he has not endeavored to hire out for day wages if he could get contracts. This may account for the fact that it was impossible to obtain a record of any continuous employment during the period." By this comment, counsel seem to insinuate that Sorvik was coddling himself. But, a few pages later on in the same brief, we are told: "The plaintiff worked whenever there was work for him to do, and such employment is evidence of the fact that he had the physical ability to follow continuously a gainful occupation."

As a matter of fact, Sorvik acted prudently in taking contract work in preference

to carpenter's jobs; for his experience has shown him that the dust, which is almost an inevitable concomitant of carpentry, caused a recurrence of his asthmatic symptoms.

Again, at another place in their brief, counsel for the government state: "There is no basis in the record for appellant's statement 'That on several occasions he became ill, and was forced to discontinue his work' as the testimony of Nokes in this respect is as follows: * * *" Yet, only half a page farther down, counsel make this contradictory concession: "Mr. Nokes did testify that plaintiff lost two or three days a couple of times on account of illness, and this was over a period of two years." As we have seen, the "two years" referred to consisted only of 78 actual working days.

The very inconsistencies in the government's arguments indicate some of the difficulties presented by the evidence. And these difficulties should have been resolved, not by the trial judge but by a jury of the veteran's peers.

This principle was definitely stated by this court in United States v. Rasar, supra: "Total disability is not an abstract concept. It is not the same in all circumstances and under all conditions. It is a relative term, and whether it is present in a particular case depends upon the peculiar facts and circumstances of that case. The problem of determining whether it exists in a given case is concrete and relative—not abstract. The mere fact that appellee may be able to engage in some light occupation requiring very little physical effort, or that he may work for short intervals at some character of employment, does not imply that he may not be totally disabled within the meaning of the World War Veterans' Act 1924, § 202, as amended (38 USCA § 473), and its regulations. To be sure, he may not claim total disability merely upon the ground that he is no longer able to engage in farming, yet if his disability renders it impossible for him to pursue continuously any gainful occupation for which he is physically and mentally qualified, that in law amounts to total disability. Under the facts disclosed by the record the case was one for the jury."

In the instant case, the record, though far from satisfactory, warrants, we think, submission of the case to the jury.

Judgment reversed, with instructions to grant a new trial.