## UNITED STATES v. INGLE.
### No. 6478.

Circuit Court of Appeals, Ninth Circuit.
Oct. 19, 1931.

George Neuner, U. S. Atty., and Livy Stipp and Chas. W. Erskine, Asst. U. S. Attys., all of Portland, Or.

J. O. Stearns, Jr., and Littlefield & Helgerson, all of Portland, Or., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and WEBSTER, District Judge.

SAWTELLE, Circuit Judge.

On July 28, 1916, appellee, hereinafter referred to as the plaintiff, entered the military forces of the United States and thereafter served with said forces until February 18, 1918, upon which date he was honorably discharged therefrom.

There was issued to him a policy of war risk insurance in the sum of $10,000, where-

in the United States promised and agreed to pay to him, in case he should become totally and permanently disabled, the sum of $57.50 per month from the date of total and permanent disability, should same occur during the life of said policy, conditioned, of course, upon the payment of premiums as therein specified.

The case was submitted to a jury, who returned a verdict for the plaintiff and found that plaintiff became totally and permanently disabled on February 18, 1918. Judgment was entered accordingly.

At the close of all the testimony, defendant moved for a directed verdict in its favor, based upon the ground that the plaintiff had failed to produce testimony sufficient to warrant the jury in bringing in a verdict in favor of the plaintiff, in that the testimony in said cause showed that plaintiff had worked to such an extent since the time his policy had ceased to be in force and effect, that he could not be said to have been totally and permanently disabled at any time while the policy was in force and effect. This motion was overruled, and an exception noted, and this ruling of the court is the basis of the defendant's one assignment of error. This assignment raises the only question presented on this appeal, namely, the sufficiency of the evidence to establish total and permanent disability incurred while the policy was in effect. We will, therefore, confine our discussion to that question.

Plaintiff's discharge, admitted in evidence, shows that when he enlisted he was 18 years old, married, and chauffeur by occupation; and that "physical condition on discharge, poor. Not recommended for reenlistment."

Testimony of the plaintiff tends to show that at the time he was discharged from the army he was told by army physicians that he was suffering from tuberculosis of the lungs; his weight was 110 or 112 pounds; after his discharge he was sent to his wife's home at Wichita, Kan., in a Pullman car, and from the Pullman to his home in an ambulance; at that time he was put to bed and a physician was called; he had coughing spells, night sweats, pains in his chest and back, and bled at the lungs; the physician and the Red Cross took care of him. After several weeks he was able to get around and obtained employment with the American Railway Express Company, checking waybills. At times while in that employment he continued to cough violently and lost on the average of six or seven days each month. The agent of the company who put him to work "boosted" him along. He became ill and left his work, later returning. At that time he was still coughing and expectorating, was weak, and suffering with pains in his chest. He was absent from work on account of illness and finally was discharged by his employer, and remained out of employment for some time. He had previously, in 1918, been examined for selective draft and rejected, and advised by physicians to go to Arizona.

In 1921 he started for Tacoma, Wash., and on the way had a hemorrhage while on the train, being forced to stop at Portland. Upon arriving in Tacoma he was sick, weak, coughing and spitting blood, and stayed in bed for a couple of weeks. Two or three weeks after his arrival in Tacoma he obtained employment with Cornell Brothers, doing hard labor, but was discharged at the end of a week because unable to work. After a month or six weeks of idleness he returned to work for Cornell Brothers in a different job, sort of errand boy for the foreman, driving him around. He worked on this job whenever he was able, sometimes two or three days a week, some weeks not at all. This employment continued for about a year.

During this time he was taking vocational training as a carpenter and receiving treatment and instructions for his condition at a government hospital. After leaving Cornell Brothers in 1923, or the latter part of 1922, he worked for Wheeler-Osgood Company for about six months running a hoist, which was operated by electric buttons. Thereafter he worked for Bonnell Company for three or four months, keeping time and running errands for the foreman. Illness forced him to quit this job, and he did nothing from then until the latter part of 1924. At that time he secured a political job that called for little or no labor and only required him to be on the job about 50 per cent of the time. This job continued for about two years, until the fall of 1926.

For the next year, until August, 1927, he worked for the government as customs inspector, or chauffeur, being forced to quit because of illness, and spent the next couple of months in bed. The balance of the year, some three or four months, he worked for the Maytag Washing Company, making deliveries in his machine on a commission basis. The following six months he was unable to work because of illness. For three or four months in the fall of 1928 he worked as an inspector for the city of Aberdeen, checking concrete mix in buildings, being forced to quit in November, 1928, because of sickness.

About February, 1929, he started to drive to Arizona, but was taken sick at Portland with a fever and temperature, was unable to continue the trip, and was forced to remain in bed for three weeks. He then secured employment with the Richfield Oil Company and worked for a couple of months. His condition grew worse during this employment, and, when he fell off of a derrick during a coughing spell and fractured his knee, he was forced to quit the job. Shortly thereafter he secured employment with a dry cleaning establishment as a driver, and was employed there at the time of the trial in the court below. His work there consisting of making deliveries, using his own automobile. He has been unable to work more than half the time, and when off he hires another man to drive for him. During all these years his physical condition has been about the same as when he was discharged from the army.

Plaintiff's testimony as to his physical condition after his return from the army was corroborated by that of his wife, Clara Ingle.

Dr. Evans testified that for about a year previous to the trial he had been treating the plaintiff; that he complained of pains in his chest, of being languid, worn-out, tired, of coughing, night sweats, and inability to work steadily, or at any job that required much physical labor. The witness stated that plaintiff's symptoms indicated tuberculosis; that from further examinations it is his opinion that plaintiff is suffering from active tuberculosis of the lungs and is unable to regularly follow a gainful occupation. The witness also testified that an X-ray picture of plaintiff's chest indicated a tubercular condition in one lung. The witness did not test plaintiff's sputum for tuberculosis.

Dr. Smith testified that he examined plaintiff the day before the trial and considered him a tubercular patient. This witness also stated that the X-ray picture disclosed a tubercular condition in one lung. The witness made no sputum tests. Dr. Smith concluded his testimony with the statement: "After talking with this man, I think he was trying to make a living against great odds—that is my honest opinion. I think he should not have worked, from the history I got."

We believe there is substantial evidence here tending to establish plaintiff's total and permanent disability at the time of his discharge, notwithstanding strong evidence to the contrary. However, it would seem that the testimony of some of the witnesses called on behalf of the defendant tended to corroborate the witnesses for the plaintiff.

Gladys Hulme, who kept the records of the Hollywood Cleaners and who, with her husband, ran the business in which plaintiff worked, testified: "During the time Mr. Ingle worked for us he has not worked steady; he has been off frequently. I do not know why. He would come to work and say he would have to have somebody in his place, that he was ill. * * * My husband and I ran the business. Mr. Ingle was employed by him and me. We would not have kept him on the job except for sympathy and because of his condition. We kept him because we were sympathetic to him."

Peter B. Mildon, who was foreman of construction and had charge of the records for the Wheeler-Osgood Company, said, pertaining to plaintiff's employment by that company: "The book [time book] shows blank spaces where some days he didn't work that weren't Sundays. There were five Sundays in that month [August, 1923]. That would leave four days he was unemployed. The records do not show why he was unemployed. He was attending a physician for physical examination or observation, or some such thing. The records do not so show. He was merely off the job and told me that was what he was doing."

John R. Dille, who was connected with the firm of Albertson, Cornell Brothers & Walsh during the years 1921 to 1923, testified that plaintiff was brought to the company's office by a man connected with the Veterans' Bureau, that he noticed no physical impairment of the plaintiff, but that: "While with us he left the office, I don't know how many times, to go out to Cushman Hospital. I have no idea how many times. He wasn't called upon to be at work daily or to accomplish certain duties. He really was on his own."

Harry Steinseifer, under whom plaintiff worked as a laborer part of the years 1921 and 1923, among other things testified: "I knew he was sickly. I did not know the nature of his affliction. He told me the doctor had told him he had tuberculosis and had given him six months to live. * * * I remember that he was frequently laid off on account of illness. * * * When jobs were too heavy for him and we had to take him off, we put him on lighter work. He was able to perform the lighter work at times and at other times he would say that he had to go home. * * * At the time he was with the C. E. Bonnell Company he was taking vocational training and in ill health."

Clement E. Bonnell, general contractor for whom said Steinseifer was foreman, testified that the plaintiff worked for his firm during 1923. "I couldn't say whether Mr. Ingle earned the wages we paid him or not. I think we would have kept him on the payroll whether his work was satisfactory or not."

It will thus be seen that the issue was one of fact and not of law. In considering the evidence of plaintiff's work record and the record of his earnings since his discharge from the army, the jury no doubt considered the testimony as to plaintiff's physical condition during all the time he was working, and concluded that he worked when he was physically unable to do so, and did not really earn the money he received, or that, as plaintiff testified, his employers favored him because he had served in the army.

We have carefully examined the record and cannot conclude as a matter of law that the court erred in submitting the case to the jury. We think the late Judge Bean, who presided at the trial, aptly stated the situation when he said: "The question in this case, and the only question, is whether the man was permanently and totally disabled at the time this policy expired, in 1918. All the evidence is to be considered on that question, and that question only. Unless he was permanently and totally disabled at the time this policy expired he is not entitled to recover on this policy. Because he voluntarily allowed the policy to lapse, he has no more right to recover, unless he was permanently and totally disabled at that time than a man who takes out a fire insurance policy on his house and allows the policy to lapse. The whole question is the question of his condition at the time he was discharged from the army, and if so, whether that was permanent. There is evidence, I believe, and I think it is admitted by the Government, that he was discharged from the army February 18th, 1918. Then later, the evidence shows he went to work for an express company, and worked there a year and a half or two years. He testifies that in his work there he did not have very much to do, much of the time working at night; his work was not difficult, and he was ill during the time he was working there. Then later, in his work, for the City of Tacoma, and the City of Aberdeen, and in the public service, and the prohibition service, he testifies that he was not required to do very much, and did not do very much. In other words, from the testimony it appears he was drawing a salary for work he did not perform. The question, I think, is for the jury, to determine from all the testimony whether this man was permanently disabled at the time he was discharged from the army. I don't believe it is a question for the court. It is near the border line, yet I think the jury should pass on that question. The jury will understand that because the court overrules this motion that it is not his opinion that this man is entitled to recover; that ruling only amounts to a statement of law, that in the opinion of the court there is some question for the jury to determine, and that question is, whether he was permanently and totally disabled at the time this policy expired in 1918."

It would seem unnecessary to review the recent cases involving similar questions decided by this and other courts. Attention is called, however, to our recent opinion in the case of Sorvik v. United States, 52 F.(2d) 406, filed September 2, 1931. In that case we discussed the quantum of evidence necessary to sustain the verdict for the plaintiff under the World War Veterans' Act 1924 (38 USCA § 421 et seq.), and also the meaning of the term "total and permanent disability."

We find no error in the record and the judgment is affirmed.